UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

PAYTON THOMAS JARRARD,

               Petitioner,

     v.                             CAUSE NO.: 3:22-CV-724-DRL-MGG

WARDEN,

               Respondent.

## OPINION AND ORDER

Payton Thomas Jarrard, a prisoner without a lawyer, filed a habeas corpus petition challenging his 2015 child molestation conviction in Tippecanoe County under case number 79D01-1401-F1-1. (ECF 2.) For the following reasons, the court denies his petition.

## BACKGROUND

In deciding the petition, the court must presume the facts set forth by the state court are correct, unless Mr. Jarrard rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). On post-conviction review, the Indiana Court of Appeals set forth the facts underlying Mr. Jarrard's conviction as follows:

> In August 2014, Jarrard was in a relationship with eleven-year-old T.C.'s mother. One night, T.C. was home with her two older brothers while her mother was gone. Although Jarrard lived elsewhere, he was at the home with T.C. and her brothers. After T.C. went to bed, she was awoken by Jarrard shaking her bed as he touched her "bottom area" on the front, in the area she used to urinate. T.C. described feeling Jarrard touch inside her and it hurting. T.C. immediately reported the incident to her brother, who called their mother. Their mother told the children to go to a friend's house, and the incident was reported to the police.

T.C.'s Mother ("Mother") talked to the police, but T.C. did not. T.C. went to Hartford House for a forensic interview and told the interviewer what had happened to her. T.C. also went to Riley Hospital, where sexual assault nurse examiner Anna Gordon ("Nurse Gordon") examined her. T.C. had taken a shower before the examination. Nurse Gordon spoke only to Mother about the offense, and T.C. was not present when they spoke.

In September 2014, the State charged Jarrard with Level 1 felony child molesting. Specifically, the State alleged that twenty-nine-year-old Jarrard had used his hand to engage in "other sexual conduct" with eleven-year-old T.C. The State also alleged that Jarrard was an habitual offender.

The trial court held a two-day jury trial in January 2015. Public defenders Thomas O'Brien ("Trial Counsel O'Brien") and Matthew Harris ("Trial Counsel Harris") represented Jarrard at trial. Jarrard's theory of defense was that the State could not meet its burden of proof. Jarrard's counsel challenged the credibility of T.C.'s testimony by focusing on the fact that T.C. did not see Jarrard touch her and by attempting to portray T.C. as being confused about what had happened. Counsel[] also relied on the fact that the limited DNA evidence did not specifically identify Jarrard.

During trial, T.C. testified that she had been asleep and awoke to Jarrard on the side of her bed. She noticed that her pajama pants and underwear had been pulled down. She testified that Jarrard had touched her "bottom area" and explained that he had touched "[t]he front" of that area that she used "[t]o urinate." T.C. further testified that she had felt Jarrard touching her on the "inside" and that it "hurt." Additionally, T.C. testified that the pain she felt inside the area where she urinated was a greater level of pain than she had experienced when she had broken her arm.

Mother testified that, after she had found out what Jarrard had done to T.C., she had contacted the police and talked to Child Protective Services. Mother also testified that she had taken T.C. to Hartford House for a forensic interview and to Riley Hospital for a medical examination. Additionally, Mother testified that T.C. had already taken a shower before she had her medical exam and that she had given T.C.'s pajama pants and underwear to an officer a few days after the offense.

The State introduced DNA evidence that showed no conclusive results. The certificates of analysis from forensic DNA analyst Shawn Stur ("Forensic Analyst Stur") and forensic biologist Nicole Keeling ("Forensic Biologist Keeling") indicated that three swabs (vaginal/cervical swabs, external genital swabs, and anal swabs) taken from T.C during her medical exam

had "failed to demonstrate a sufficient quantity of male DNA" for "autosomal STR analysis" and for "further Y-STR DNA analysis." Forensic Analyst Stur also testified that the three swabs "[ha]d not give[n] ... enough male DNA to continue with [an] analysis." Forensic Biologist Keeling testified that the anal swabs did not have male DNA and that vaginal/cervical swabs and external genital swabs had a "slight" amount of male DNA but not enough to perform a Y-STR analysis. Forensic Biologist Keeling also testified that the Y-STR DNA result from the swab from T.C.'s underwear showed the presence of a mixture of at least four males and that the swab from T.C.'s pajama pants showed the presence of a mixture of at least five males, resulting in no conclusions that could be drawn. The prosecutor set forth a hypothetical regarding a person living in a house with multiple brothers, as T.C. did, and asked whether it was surprising to have the presence of multiple male contributors on those items. Forensic Biologist Keeling testified that there was "the potential for multiple male contributors to be present on those samples" because she was looking at skins cells that could be on the surface.[1]

When Trial Counsel O'Brien cross-examined Forensic Analyst Stur and Forensic Biologist Keeling, counsel had them confirm that none of the DNA testing swabs had specifically identified Jarrard. Forensic Analyst Stur responded that she had not done any comparison testing, and Forensic Biologist Keeling responded that she had not identified him because the samples had not had enough male DNA to develop a Y-STR profile.

Nurse Gordon testified during direct examination that the physical examination of T.C. could neither confirm nor deny whether any sexual abuse had occurred. On cross-examination of Nurse Gordon, Trial Counsel Harris attempted to question Nurse Gordon about a section of her medical report in which she had written down statements from her conversation with Mother. Specifically, Trial Counsel Harris sought to have Nurse Gordon testify about a statement from Mother regarding what she had said that T.C. had reported to Mother. The State objected based on hearsay and pointed out that Jarrard's counsel had had the opportunity but had not cross-examined Mother about her statement. Trial Counsel Harris indicated that he was asking the question for impeachment purposes. After noting

---

[1] At trial, T.C.'s mother testified that upon being directed by police to obtain T.C.'s pajama bottoms and underwear from that night, she called home and told T.C.'s older brother to take the clothes out the hamper and put them under her mattress "so nobody else [could] get a hold of them." (ECF 16-2 at 64.) She further testified her children sometimes slept on that mattress, and that T.C.'s brothers and two other males had helped her move the mattress. (*Id.* at 66.) T.C. also described that she had been wearing the pajama bottoms in various areas of the house prior to going to bed, including sitting on the floor while watching television. (*Id.* at 125.)

that trial counsel could have cross-examined Mother about her statement
or cross-examined T.C. about whether she had made such a statement to
Mother, the trial court sustained the State's objection.

At the conclusion of Nurse Gordon's testimony, a juror submitted a
question, asking Nurse Gordon to relate what Mother had told her. The trial
court declined to ask the question. Trial Counsel Harris then made an offer
of proof as to the testimony that he sought from Nurse Gordon. Trial
Counsel Harris stated that, according to the medical exam record, Mother
had told Nurse Gordon that T.C. had "disclosed that [Jarrard] touched her
but [had] n[o]t put anything inside[.]"

*Jarrard v. State*, 175 N.E.3d 366 (Table), 2021 WL 4448795, 1-3 (Ind. Ct. App. Sept. 29, 2021)

(headnotes and internal citations omitted). After deliberating, the jury found him guilty

of child molesting, and he admitted to his guilt on the habitual offender charge. *Id.* at 3.

He was sentenced to an aggregate term of 52 years in prison. (ECF 15-1 at 7.)

On direct appeal, Mr. Jarrard raised three claims: (1) the trial court improperly

sustained the prosecutor's objection to Nurse Gordon's testimony; (2) the jury

instructions on the meaning of "penetration" under Indiana law were inaccurate; and (3)

the evidence was insufficient to support his conviction. *Jarrard v. State*, 42 N.E.3d 173

(Table), 2015 WL 6954944, 1-3 (Ind. Ct. App. Nov. 10, 2015). The Indiana Court of Appeals

rejected each claim. The court determined that the prosecutor's objection was properly

sustained because Mr. Jarrard's counsel was trying to "impeach" Nurse Gordon with an

out-of-court statement made by someone else, T.C.'s mother, which was not permissible

under state law. *Id.* at 1. The court next determined that Mr. Jarrard waived his argument

about the jury instructions by failing to object at trial; but, notwithstanding the waiver,

the record showed the jury was properly instructed on the meaning of "penetration"

under Indiana law. *Id.* at 2. Finally, the court determined that T.C.'s testimony was

sufficient evidence to support his conviction. *Id.* at 3. The court thus affirmed in all respects. *Id.*

Mr. Jarrard filed a petition to transfer to the Indiana Supreme Court asserting one claim: that the trial court erred in connection with the jury instructions on penetration. (ECF 15-6.) The Indiana Supreme Court denied the petition without comment on January 28, 2016. *Jarrard v. State*, 43 N.E.3d 1280 (Table) (Jan. 28, 2016). He did not seek review in the United States Supreme Court. (ECF 2 at 1.)

On January 13, 2017, Mr. Jarrard filed a *pro se* petition for post-conviction relief, which was later amended after the Indiana Public Defender's Office filed an appearance on his behalf. (ECF 15-7.) He asserted grounds of ineffective assistance of counsel: (1) trial counsel failed to impeach T.C. with a prior inconsistent statement she made to her mother; (2) trial counsel failed to adequately crossexamine the DNA witnesses; and (3) trial counsel failed to object to comments by the prosecutor during closing argument misstating the definition of "penetration" under Indiana law. *Jarrard*, 2021 WL 4448795, at 4-7. An evidentiary hearing was held, at which his two trial attorneys and T.C.'s mother testified. *Id.* He also submitted as exhibits a post-trial deposition transcript from T.C., affidavits from the state's two DNA experts explaining their findings, T.C.'s medical records, and the record from his direct appeal. *Id.* Following the hearing, the court denied post-conviction relief. *Id.*

On post-conviction appeal, Mr. Jarrard asserted the same claims of ineffective assistance of counsel. *Id.* The Indiana Court of Appeals rejected each of them in turn. The court concluded that his attorneys made reasonable strategic decisions about the scope

of their crossexamination of T.C. and the DNA witnesses. *Id.* at *5-7. The court further concluded that Mr. Jarrard did not establish prejudice in connection with counsel's failure to object to the prosecutor's comments during closing argument because the jury was properly instructed on the meaning of penetration under Indiana law. *Id.* The court also noted that he raised a claim of "cumulative" error, but concluded that this claim was waived under state law because he did not assert it in his post-conviction petition. *Id.* at 7 n.5. Notwithstanding the waiver, the court found no error, cumulative or otherwise, warranting post-conviction relief. *Id.*

Mr. Jarrard sought transfer to the Indiana Supreme Court raising his claims that his attorneys were ineffective in failing to adequately crossexamine T.C. and the state's DNA witnesses. (ECF 15-13 at 2.) On January 6, 2022, the Indiana Supreme Court denied the petition without comment. *Jarrard v. State*, 180 N.E.3d 930 (Table) (Ind. Jan. 6, 2022).

On August 20, 2022, Mr. Jarrard tendered his federal petition for mailing.[2] (ECF 2 at 8.) He asserts nine claims, which he articulates as follows: (1) "Unsupported evidence regarding finger/hand defined in Ind. Code 35-31.5-2-221.5;" (2) "Trial court invoking legal[]y insufficient analysts as a witness for the State;" (3) "Trial court erroneously admitted expert testimony from Forensic Scientist regarding Male DNA;" (4) "False DNA Presented at trial;" (5) ineffective assistance by trial counsel "regarding failure to question witnesses prior to trial;" (6) ineffective assistance by trial counsel "regarding failure to retain or investigate DNA Analyst;" (7) "Prior inconsistent statement of T.C. to her

---

[2] The handwritten date is difficult to read and may in fact be August 26, 2022. (ECF 2 at 8.) The court has afforded Mr. Jarrard the benefit of the doubt and accepted the date as August 20, 2022.

mother;" (8) "Improper closing arguments by Prosecutor claiming physical evidence regarding DNA;" and (9) cumulative error that denied him a "fair trial." (ECF 2 at 3-7.)

The respondent argues that the petition was not timely filed and must be dismissed. (ECF 15 at 7-8.) Alternatively, the respondent argues that claims one, two, three, four, six, eight, and nine are all procedurally defaulted and that the remaining claims (five and seven) fail on the merits. (*Id.* at 8-24.) Mr. Jarrard's traverse was due by February 23, 2023.[3] (ECF 18.) That deadline passed without one.

ANALYSIS

Mr. Jarrard's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which allows a district court to issue a writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Habeas corpus was intended as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Gilbreath v. Winkleski*, 21 F.4th 965, 981 (7th Cir. 2021) (citation and quotations omitted). To succeed, a petition must meet the stringent requirements of 28 U.S.C. § 2254(d), set forth as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3] The original deadline was January 6, 2023. (ECF 13.) Mr. Jarrard did not file a traverse by that deadline, and instead filed a "Motion to Grant Petitioner's Habeas Corpus by Default" after the respondent filed the return. (ECF 17.) This motion was denied because the respondent was not in default, but as a courtesy the court extended the deadline for him to file a traverse. (ECF 19.)

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This standard is "difficult to meet" and "highly deferential." *Hoglund v. Neal*, 959 F.3d 819, 832 (7th Cir. 2020) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)). "It is not enough for a petitioner to show the state court's application of federal law was incorrect; rather, he must show the application was unreasonable, which is a 'substantially higher threshold.'" *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). In effect, "[a] petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

A.    Timeliness

The respondent first argues that the petition is untimely and cannot be considered on the merits. AEDPA contains a strict statute of limitations, set forth as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has

been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d). The statute of limitations is tolled when "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).

On direct appeal, the Indiana Supreme Court denied his petition to transfer on January 28, 2016, and he did not seek review in the United States Supreme Court. (ECF 2 at 1.) Under 28 U.S.C. § 2244(d)(1)(A), his conviction became final when the time for seeking review in the United States Supreme Court expired on April 27, 2016. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012) (for habeas petitioners who do not complete all levels of review, judgment becomes final when the time for seeking further review expires); *see also* U.S. Sup. Ct. R. 13(1) (petition for writ of certiorari must be filed within 90 days of state court's judgment).

On January 13, 2017, he filed a post-conviction petition, which tolled the deadline under 28 U.S.C. § 2244(d)(2). As of that date, 261 days had elapsed on the federal clock. The deadline remained tolled until the post-conviction proceedings concluded on January 6, 2022, when the Indiana Supreme Court denied his petition to transfer. *See Lawrence v. Florida*, 549 U.S. 327, 332 (2007) (holding that the statute of limitations is tolled under § 2244(d)(2) "only while state courts review the application"). At that point, Mr. Jarrard had 104 days remaining on the federal clock, or until April 20, 2022, to file a timely

petition under 28 U.S.C. § 2244(d)(1)(A). He did not do so, and instead waited until August 20, 2022, to put his petition in the prison mail system, which was four months after the deadline had expired.

He does not argue, nor can it be discerned, that one of the other provisions of § 2244(d)(1) applies to render any of his claims timely.[4] In the petition, when asked to state why his petition is timely under the provisions of 28 U.S.C. § 2244(d), he states simply: "I have followed all the rules without undue delay." (ECF 2 at 8.) This statement does not explain why the petition should be deemed timely even though it was filed four months beyond the statutory deadline, nor does it provide a potential reason to excuse the late filing. Therefore, the petition is untimely.

B.      Procedural Default

Assuming for the sake of argument Mr. Jarrard could overcome the untimeliness bar, the respondent alternatively argues that all but two of his claims are procedurally defaulted. (ECF 15 at 8-13.)

---

[4] Though he has not expressly made this argument, the court has considered that claims two, three, four, five, and six appear to be based at least in part on affidavits prepared by the DNA experts in the post-conviction proceedings. Those affidavits were signed on November 15, 2018. (*See* ECF 16-8 at 22, 24.) Arguably, 28 U.S.C. § 2244(d)(1)(D) could apply to these claims, but Mr. Jarrard has not made any attempt to show that he exercised diligence in uncovering the factual predicate for the claims. There is no basis in the record to conclude that the information in the affidavits could not have been obtained prior to November 2018, as the information was essentially a clarification of the experts' 2015 trial testimony. The court concludes that these claims are not timely under § 2244(d)(1)(D). *Villanueva v. Anglin*, 719 F.3d 769, 774 (7th Cir. 2013) ("The court must consider both the date on which the petitioner discovered the factual predicate of the claim *and* whether the petitioner exercised due diligence in discovering that information. . . . [T]he clock [] starts at the time a reasonable person would have discovered those facts.").

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Hoglund*, 959 F.3d at 832. The exhaustion requirement is premised on a recognition that the state courts must be given the first opportunity to address and correct violations of their prisoners' federal rights. *Davila v. Davis*, 582 U.S. 521, 527-28 (2017); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claim in one complete round of state review. *Baldwin v. Reese*, 541 U.S. 27, 30-31 (2004); *Boerckel*, 526 U.S. at 845. This includes seeking discretionary review in the state court of last resort. *Boerckel*, 526 U.S. at 848. The companion procedural default doctrine, also rooted in comity concerns, precludes a federal court from reaching the merits of a claim when the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground, or when the claim was not presented to the state courts and the time for doing so has passed. *Davila*, 582 U.S. at 527; *Coleman v. Thompson*, 501 U.S. 722, 735 (1991).

A habeas petitioner can overcome a procedural default by showing both cause for failing to abide by state procedural rules and resulting prejudice. *Davila*, 582 U.S. at 528. "Cause" in this context means "an objective factor external to the defense that impeded the presentation of the claim to the state courts," and only applies to factors that "cannot fairly be attributed to the prisoner." *Crutchfield v. Dennison*, 910 F.3d 968, 973 (7th Cir. 2018) (citation and quotations omitted). A habeas petitioner can also overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006).

Claim one can be read as a challenge to the sufficiency of the evidence. (ECF 2 at 3.) Mr. Jarrard raised a claim on direct appeal challenging the sufficiency of the evidence, but he did not include this claim in his petition to transfer to the Indiana Supreme Court. (ECF 15-6.) It is therefore procedurally defaulted. *Boerckel*, 526 U.S. at 848.

He suggests in his petition that the failure to present this claim was caused by attorney error. (ECF 2 at 3.) Attorney error rising to the level of a Sixth Amendment violation can provide cause to excuse a procedural default. *Davila*, 582 U.S. at 528. Here, however, the default occurred at a stage when Mr. Jarrard did not have a right to counsel, as there is no Sixth Amendment right to counsel to seek discretionary review with a state supreme court. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Wainwright v. Torna*, 455 U.S. 586, 587 (1982). When there is no constitutional right to counsel, attorney error cannot supply cause to excuse a procedural default.[5] *Davila*, 582 U.S. at 529; *Coleman*, 501 U.S. at 752. Therefore, claim one is defaulted and cannot be considered on the merits.

Mr. Jarrard articulates claim two as follows: "Trial court invoking [] legally insufficient analysts as a witness for the State." In his view, the DNA experts' "statements at trial failed to exclude[] every possible and reasonable hypothesis regarding the DNA analyst that would gave Jarrad a fair trial and not prejudice Jarrard's innocen[ce]." (ECF

---

[5] Mr. Jarrard also suggests that the default is attributable to his post-conviction counsel. (ECF 2 at 3.) However, under Indiana law, claims that are known and available at the time of direct appeal, including sufficiency of the evidence claims, cannot be raised on post-conviction review. *See Sanders v. State*, 765 N.E.2d 591, 592 (Ind. 2002); *Peele v. State*, 168 N.E.3d 1059 (Table), 2021 WL 1343547, 4 (Ind. Ct. App. Apr. 12, 2021). Furthermore, he did not have a Sixth Amendment right to counsel in the post-conviction proceedings, so any error by post-conviction counsel does not provide cause to set aside the default of his sufficiency of the evidence claim. *Coleman*, 501 U.S. at 752; *Finley*, 481 U.S. at 555.

2 at 3.) Although somewhat unclear, he appears to be claiming that he was denied a fair trial because the state's DNA evidence was legally insufficient. In support, he points to affidavits submitted by the DNA analysts in the post-conviction proceedings.

The Indiana Court of Appeals summarized the facts surrounding the affidavits as follows:

> During the post-conviction hearing, Jarrard offered affidavits from the two trial DNA witnesses. In Forensic Biologist Keeling's post-conviction affidavit, she acknowledged that she had testified at trial that the vaginal/cervical swabs and external genital swabs "had a slight amount of male DNA that was below our cutoff for Y-STR analysis" and that the anal swabs "did not have male DNA." Forensic Biologist Keeling further averred that "[h]ad [she] been questioned further, [she] would have explained that the male DNA values [she had] observed were so low that [she] could not be certain if there was actually male DNA present or if the values were the result of background noise[,] such as "signal from the instrument, bubbles in the plate, and dust on the plate." In Forensic Analyst Stur's post-conviction affidavit, she acknowledged her trial testimony was that the three swabs "[ha]d not give[n] [her] enough male DNA to continue [her] analysis." Forensic Analyst Stur further averred that "[h]ad [she] been questioned further, [she] would have explained that [she had] classified the amount of male DNA in these three items as "undetermined[,]" which "mean[t] either there was very little male DNA in these items, or no male DNA at all." In the post-conviction affidavits of the DNA witnesses submitted by the State, Forensic Biologist Keeling and Forensic Analyst Stur both declared that their trial testimonies had been "true and accurate."

*Jarrard*, 2021 WL 4448795 at 6 (internal citations omitted).

Based on these affidavits, Mr. Jarrard argues that the DNA evidence was legally insufficient and denied him a fair trial. But he acknowledges that he did not assert such a claim in state proceedings. His failure to fairly present such a claim to the state courts means that it is procedurally defaulted. *See Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017).

He asserts that the default should be excused because "my attorneys for trial, appeal, and post-conviction overlooked it." (ECF 2 at 3.) As stated, attorney error amounting to a Sixth Amendment violation can provide cause to excuse a procedural default. *Davila*, 582 U.S. at 527. Assuming the default occurred at a stage when he was entitled to counsel, the exhaustion doctrine requires that an ineffective-assistance-of-counsel claim be presented to the state court as an independent claim before it may be used to establish cause for a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Mr. Jarrard did not exhaust a claim in the state proceedings that his trial, appellate, and post-conviction attorneys were ineffective in failing to argue that the state's DNA evidence was legally insufficient. On post-conviction review, he argued that his trial attorneys were ineffective in not properly cross-examining the DNA witnesses. *Jarrard*, 2021 WL 4448795 at 4-7. Although related, that claim involved different operative facts than his claim that the attorneys were ineffective in not arguing that the state's DNA evidence was legally insufficient. *Hicks*, 871 F.3d at 530 (to fairly present a claim to the state courts, the "petitioner must place before the state court both the controlling law and the operative facts" supporting the claim); *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) ("A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [the petitioner] must have 'identif[ied] the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'"). He has not provided cause to set aside the default of claim two.

In claims three and four, he relatedly argues that the trial court erred in admitting the DNA evidence and that "false" DNA evidence was presented at his trial. However,

he did not raise these claims in state court, either on direct appeal or post-conviction review. His failure to fairly present these claims to the state courts means that they are procedurally defaulted. *Hicks*, 871 F.3d at 530.

He suggests in his petition that the default was caused by his post-conviction counsel. (ECF 2 at 4.) As a general rule, errors by post-conviction counsel do not qualify as cause to set aside a procedural default. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). The Supreme Court has recognized an exception to this rule, when ineffective assistance by post-conviction counsel can provide cause to set aside the default of a claim of ineffective assistance by trial counsel. *Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). This so-called *Martinez-Trevino* exception applies to prisoners in Indiana. *Brown v. Brown*, 847 F.3d 502, 513 (7th Cir. 2017). It is of no benefit to Mr. Jarrard here, however, because *Martinez-Trevino* is a narrow exception that applies solely to review of defaulted claims of ineffective assistance by trial counsel, not to other types of defaulted claims. *Davila*, 582 U.S. at 529-30. Thus, alleged errors by Mr. Jarrard's post-conviction counsel cannot be used to obtain review of a defaulted claim pertaining to the sufficiency of the state's DNA evidence. He has not provided cause to set aside the default of these claims.

In claim six, he asserts that his trial attorneys were ineffective in not retaining and calling their own DNA expert as a witness. (ECF 2 at 5.) Although he raised claims of ineffective assistance of trial counsel in state court, he did not raise this specific claim, meaning that it is defaulted. *See Johnson*, 574 F.3d at 432. He again blames his post-conviction attorney for the default. (ECF 2 at 5.) An error by post-conviction counsel causing a default of his ineffective-assistance-of-trial-counsel claim would fall within the

*Martinez-Trevino* exception. However, to obtain relief he must show that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say . . . that the claim has some merit." *Martinez,* 566 U.S. at 9, 14. The respondent argues that he has not satisfied this standard. (ECF 15 at 18.) The court concludes that even if there is some threshold merit to his claim, thus allowing it to be considered on the merits, the claim ultimately would not entitle him to federal habeas relief.

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). On the first prong, the central question is "whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices[.]" *Harrington v. Richter,* 562 U.S. 86, 105 (2011). The petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Gilbreath,* 21 F.4th at 981. The court's review of counsel's performance is deferential, and there is an added layer of deference when the claim is raised in a federal habeas proceeding: "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington,* 562 U.S. at 105.

In evaluating counsel's performance, the court must avoid the benefit of hindsight and respect its "limited role in determining whether there was manifest deficiency in light of information then available to counsel." *Premo v. Moore,* 562 U.S. 115, 125 (2011). An attorney's representation "need not be perfect, indeed not even very good, to be

16

constitutionally adequate." *Delatorre v. United States*, 847 F.3d 837, 845 (7th Cir. 2017). Additionally, counsel is afforded significant discretion in selecting a trial strategy based on the information known at the time. *Yu Tian Li v. United States*, 648 F.3d 524, 528 (7th Cir. 2011). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Gilbreath*, 21 F.4th at 982. If the defendant wanted counsel to raise an argument that itself had no merit, an ineffective-assistance claim cannot succeed, because "[c]ounsel is not ineffective for failing to raise meritless claims." *Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013).

On the prejudice prong, the petitioner must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Gilbreath*, 21 F.4th at 981 (citation omitted). In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel had acted differently." *Harrington*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Mr. Jarrard argues that his attorneys should have retained a defense expert to analyze the DNA evidence so that the issues referenced in the DNA experts' affidavits could have been presented to the jury. However, at the post-conviction hearing, one of Mr. Jarrard's trial attorneys explained that they did not see a need to further explore the DNA evidence because their trial strategy was to focus on the fact that the DNA evidence

was inconclusive and did not inculpate him. *Id.* at 6. In furtherance of that strategy, counsel questioned Forensic Analyst Stur and Forensic Biologist Keeling and had them each confirm that none of the DNA testing swabs identified Mr. Jarrard. *Jarrard*, 2021 WL 4448795 at 2. During closing arguments, counsel emphasized this point again, stating: "There's no physical evidence, none, that was presented to you, that shows he committed this crime. Nothing[.]" (ECF 16-3 at 53.)

Mr. Jarrard's lead attorney had decades of trial experience, handled more than ten prior trials with DNA evidence, and had prior training related to DNA evidence. (ECF 16-7 at 74, 76-77.) The record reflects that he was well-versed in the DNA evidence. The strategy counsel adopted to highlight the fact that the DNA evidence did not inculpate Mr. Jarrard and simply move on was not unreasonable under the circumstances. *Gilbreath*, 21 F.4th at 98 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]").

Mr. Jarrard also has not made a showing that retaining a defense expert to further focus on the DNA evidence was likely to have led to a more favorable result. The jury repeatedly heard evidence and arguments that the DNA evidence was inconclusive and did not inculpate Mr. Jarrard. He wanted the jury to be told about the possibility that the swabs did not contain male DNA, which does not seem a significant distinction. As his counsel noted at the post-conviction hearing, T.C.'s household included males besides Mr. Jarrard, and so the presence of male "touch" DNA was not "any crushing blow" to the defense. (ECF 16-7 at 76.) Indeed, hearing from the DNA experts that there was male DNA present that could not be linked to Mr. Jarrard might have led the jury to consider

whether T.C. was confused and whether it was someone else in the home who had molested her. Although the jury ultimately decided to convict, the record suggests this was because of T.C.'s unequivocal testimony—which his counsel acknowledged was "extraordinarily damning"—rather than to the failure to counsel to retain a DNA expert. (*Id.* at 36, 72.) Even assuming this defaulted claim could be reviewed on the merits, it would not entitle him to habeas relief.

In claim eight, he argues that the prosecutor misstated the evidence during closing arguments when describing the DNA results. (ECF 2 at 6.) He did not assert a free-standing claim of prosecutorial misconduct in the state proceedings, either on direct appeal or in the post-conviction proceedings. *See Jarrard,* 2021 WL 4448795 at 4-8; *Jarrard,* 2015 WL 6954944 at 1-3. Although he asserted a claim on post-conviction review that his trial counsel erred in failing to object to the prosecutor's comments during closing arguments, this claim pertained to the prosecutor's comments on the meaning of "penetration," not to a comment about the DNA evidence. *Jarrard,* 2021 WL 4448795 at 7. He also couched this claim in terms of a violation of his Sixth Amendment right to counsel, not to the denial of his right to a fair trial, which would be governed by a different body of law. *Id.*; *see also Darden v. Wainright*, 477 U.S. 168 (1986). His failure to fairly present this claim to the state courts means that it is procedurally defaulted. *Hicks*, 871 F.3d at 530. He doesn't acknowledge the default or provide any grounds to excuse it.

In claim nine, he asserts that the "cumulative effect of the errors in this case deprived Jarrad a fair trial." (ECF 2 at 7.) Specifically, he argues that he was denied a fair trial because of misleading DNA evidence, the prosecutor's alleged misstatements, and

the testimony of T.C. that she was "molested with Jarrard's finger/hand but in all reality did not see and only assumed it was a finger," among other errors. (ECF 2 at 7.) "Trial errors which in isolation are harmless might, when aggregated, alter the course of a trial so as to violate a petitioner's right to due process of law." *Alvarez v. Boyd*, 225 F.3d 820, 824–25 (7th Cir. 2000). But Mr. Jarrard did not assert a claim in the state proceedings that cumulative error related to the DNA evidence, T.C.'s testimony, and other factors resulted in a due process violation, either on direct appeal or post-conviction review.

On post-conviction review, he argued that the "cumulative effect of trial counsel's deficient performance prejudiced him," but that claim involved different operative facts and different governing law. *See Hicks*, 871 F.3d at 530. Additionally, the Indiana Court of Appeals determined that he had waived his "cumulative error" claim by not raising it in accordance with state law. *Jarrard*, 2021 WL 4448795 at 7 n.5. This determination constitutes an adequate and independent state law ground that precludes federal review. *Thomas v. Williams*, 822 F.3d 378, 384–85 (7th Cir. 2016) ("[W]here the state courts declined to address a petitioner's federal claims because the petitioner did not meet state procedural requirements . . . the state court judgment rests on an independent and adequate state ground"). A second level of default occurred when he omitted the "cumulative error" claim from his petition to transfer to the Indiana Supreme Court. (*See* ECF 15-13.) His failure to present this claim to the state courts in accordance with state law means that it is procedurally defaulted.

He again argues that the error is attributable to errors by his post-conviction counsel. (ECF 2 at 7.) However, as explained, errors by post-conviction counsel generally

do not qualify as cause to set aside a procedural default. *Maples*, 565 U.S. at 280. Nor can he use the *Martinez-Trevino* exception to obtain review of this claim because that narrow exception only applies to defaulted ineffective-assistance-of-trial-counsel claims, not to a defaulted due process claim. Thus, the claim cannot be reviewed on the merits.

C.     Merits

The respondent acknowledges that Mr. Jarrard's two remaining claims—claims five and seven—were properly exhausted in state court and could be considered if the petition had been filed on time. Nevertheless, the respondent argues that the claims fail on the merits.

a.     Claim Five

In claim five, Mr. Jarrard asserts ineffective assistance by trial counsel "regarding failure to question witnesses." As outlined, to prevail on an ineffective-assistance claim, he must demonstrate that counsel's performance was deficient and that the deficiency prejudiced him. *Strickland*, 466 U.S. at 687. In considering this claim on post-conviction review, the Indiana Court of Appeals properly identified *Strickland* as the governing standard and concluded that he did not establish ineffective assistance of counsel under that standard. *Jarrard*, 2021 WL 4448795 at 5. Mr. Jarrard has not shown that the state court's application of *Strickland* was objectively unreasonable.

Mr. Jarrard argues that his counsel should have further crossexamined the DNA experts to show that they could not determine with certainty that the swabs contained male DNA. The state court concluded that counsel made a reasonable strategic decision in connection with the scope of their crossexamination. In effect, the defense strategy was

to argue that the DNA evidence did not advance the prosecution's case and that there was no physical evidence to back up T.C.'s account. In furtherance of this strategy, counsel elicited testimony from the DNA experts that the DNA evidence was inconclusive and did not inculpate Mr. Jarrard. They then argued this point again in closing argument. In his lead counsel's experience, trying to conduct an expansive crossexamination of a DNA expert was usually not useful, because such experts were "usually . . . robots" who "just testify [to] exactly what's on that report." (*Id.* at 77.) In light of the record, it was not unreasonable for counsel to focus on a theory that the state could not prove its case, rather than spending limited time and resources attempting to further pick apart the DNA evidence.[6] The state court's determination that he did not establish deficient performance under *Strickland* was not unreasonable.

Although the state court found no need to reach the prejudice prong, Mr. Jarrard has not established a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As previously outlined, the jury heard evidence and arguments that the DNA evidence was inconclusive and did not inculpate Mr. Jarrard. In light of the fact that T.C.'s household

---

[6] The court also considers counsel's performance as a whole during the trial proceedings. *Ebert v. Gaetz*, 610 F.3d 404, 412 (7th Cir. 2010). The record reflects that his two trial attorneys served as vigorous advocates on his behalf. Among other things, counsel filed a speedy trial motion (which required both the prosecution and the defense to expedite their trial preparations); elicited testimony from T.C.'s mother to show that Mr. Jarrard had been a father figure to T.C.; elicited testimony from T.C. that she did not actually see Mr. Jarrard put his fingers in her vagina; crossexamined the state's DNA witnesses to highlight the fact that the DNA evidence did not inculpate Mr. Jarrard; crossexamined Nurse Gordon and a doctor who examined T.C. about the lack of evidence of any physical injury suffered by T.C.; actively participated in the jury instruction conference; made a compelling closing argument pointing out weaknesses in the state's evidence; and argued for leniency at sentencing.

included two older brothers, the presence of male touch DNA was not particularly damaging to Mr. Jarrard, and it may have actually caused the jury to consider whether someone else had molested T.C. (ECF 16-7 at 76.) Furthermore, hearing that the DNA experts could not be sure whether the swabs contained male DNA would not have undercut T.C.'s unequivocal testimony that she woke to find Mr. Jarrard inserting his fingers into her vagina. His own attorney acknowledged that T.C.'s trial testimony had been consistent and "extraordinarily damning." (*Id.* at 36, 72.) He has not established a likelihood that, but for an error by his counsel, the result of the proceeding would have been different. *Harrington*, 562 U.S. at 111; *Strickland*, 466 U.S. at 694.

Based on the record, Mr. Jarrard has not shown that the state court's resolution of this claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Hoglund*, 959 F.3d at 832. Therefore, even if Mr. Jarrard had filed his petition on time, this claim would not entitle him to federal habeas relief.

b.    Claim Seven

Mr. Jarrard articulates claim seven as follows: "Prior inconsistent statement of T.C. to her mother." This appears to be a slight recasting of his claim that his trial attorneys were ineffective in not impeaching T.C. with her mother's statement to Nurse Gordon. The state court reasonably applied *Strickland* to deny this claim.

Mr. Jarrard was convicted of engaging in "other sexual conduct" with T.C., defined as "an act involving . . . the penetration of the sex organ or anus of a person by an object." Ind. Code § 35-31.5-2-221.5(2). "[E]ven the slightest penetration is sufficient to

sustain convictions for child molesting." *Spurlock v. State*, 675 N.E.2d 312, 315 (Ind. 1996). There is also no requirement that the vagina be penetrated, only the "female sex organ," which includes the "external genitalia." *Id.* "[T]he definition of the term 'object' includes the use of one's fingers." *DPaffo v. State*, 778 N.E.2d 798, 802 (Ind. 2002). Mr. Jarrard wanted his attorneys to "impeach" T.C. with her mother's statement to Nurse Gordon that T.C. told her Mr. Jarrard did not put anything inside her. He believes this would have proven that he did not "penetrate" T.C., a necessary element to convict.

As a preliminary matter, the Indiana Court of Appeals found that Mr. Jarrard failed to show T.C. had actually made a prior inconsistent statement. *Jarrard*, 2021 WL 4448795 at 6 n.4. In a deposition taken in the post-conviction proceedings, T.C. denied ever telling her mother that Mr. Jarrard did not put anything inside her. Rather, she explained that her description to her mother was that Mr. Jarrard had inserted his fingers inside her but had not used "any foreign objects." *Id.* At trial, she testified unequivocally that she woke to find Mr. Jarrard touching her with his hand "on the inside" of the area where she urinates. (ECF 16-2 at 129-30.) She testified that she knew it was on the inside because she could feel it and it "hurt." (*Id.* at 130.) In the post-conviction proceedings, she confirmed that her trial testimony had been truthful. *Jarrard*, 2021 WL 4448795 at 6 n.4. The state court's finding that T.C. did not make a prior inconsistent statement is binding unless Mr. Jarrard rebuts the presumption of correctness that attaches with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). He does not acknowledge the finding, let alone rebut it with clear and convincing evidence.

Furthermore, the Indiana Court of Appeals concluded that under Indiana law, Mr. Jarrard's attorneys could not impeach T.C. with a statement made by her mother to Nurse Gordon. *Jarrard*, 2021 WL 4448795 at 6. The court held that the Indiana Rules of Evidence only permitted impeaching a witness with the witness's own statements, not a statement made by someone else. *Id.* This court is bound by the state court's determination that state law precluded counsel from trying to impeach T.C. with the statement her mother made to Nurse Gordon. *See Harper v. Brown*, 865 F.3d 857, 861 (7th Cir. 2017) ("[O]n § 2254 habeas review, we cannot disagree with a state court's resolution of an issue of state law."); *Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004) (federal habeas court cannot "second-guess state courts in interpreting state law"). Because counsel could not have pursued this line of questioning under state law, Mr. Jarrard cannot established deficient performance or resulting prejudice. *Warren*, 712 F.3d at 1104.

The Indiana Court of Appeals also considered that Mr. Jarrard's attorneys were well aware of Mother's alleged statement to Nurse Gordon, but reasonably chose not to pursue the matter further. They were concerned that asking T.C. about her mother's statement could have opened the door to the prosecution introducing the video of T.C.'s interview at Hartford House as evidence, in which she provided an account that was consistent with her trial testimony. *Jarrard*, 2021 WL 4448795 at 4. Counsel concluded that going down this road would not "have been much of benefit to Mr. Jarrard" and could have been quite damaging. (ECF 16-7 at 31, 35.) Additionally, in counsel's view, the statement from T.C.'s mother to Nurse Gordon was not "super persuasive" evidence because it was essentially "double hearsay." (ECF 16-7 at 32.) Counsel also felt it was too

25

risky to question T.C. on the stand about the alleged statement because "T.C. was a really good witness" who effectively "killed [the defense] case. . . every time [she] spoke." (*Id.* at 35, 51.)

The record thus reflects that counsel was aware of and considered this issue, but made a reasonable strategic decision not to pursue it. *Gilbreath*, 21 F.4th at 982. The state court's resolution of this claim was not objectively unreasonable. Thus, even if the petition had been timely filed, this claim would not entitle him to federal habeas relief.

D.      Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations and citation omitted). For the reasons fully explained above, Mr. Jarrard's petition is untimely. Even if he could overcome the untimeliness bar, his claims are procedurally defaulted or without merit under AEDPA standards. The court finds no basis to conclude that reasonable jurists would debate the outcome of the petition or find a reason to encourage Mr. Jarrard to proceed further. Accordingly, the court declines to issue him a certificate of appealability.

CONCLUSION

For the reasons set forth above, the petition (ECF 2) is DENIED, and the petitioner

is DENIED a certificate of appealability. The clerk is DIRECTED to close this case.

SO ORDERED.

May 15, 2023                                   *s/ Damon R. Leichty*
                                              Judge, United States District Court